Greg **MYERS**, etc., et al., Appellees,

v.

R. Kathleen **MORRIS**, Scott County Attorney, etc., et al., Appellants.

No. 85–5243.

United States Court of Appeals, Eighth Circuit.

Submitted May 13, 1986.

Decided Feb. 3, 1987.

Rehearing and Rehearing En Banc Denied April 9, 1987.

Floyd R. Gibson, Senior Circuit Judge, filed concurring opinion.

James T. Martin, Minneapolis, Minn., for Morris, Busch, Morgan, Pint, Einertson.

Douglas J. Muirhead, Minneapolis, Minn., for Price, DeVries and Phipps-Yonas & Price, PA.

Earl P. Gray, St. Paul, Minn., for Robert and Lois Bentz.

Thomas J. Hunziker, Minneapolis, Minn., for Charles and Carol Lallak.

Michael D. Madigan, Minneapolis, Minn., for Jeffrey and Jennifer Lallak.

Robert A. Nicklaus, Chaska, Minn., for Rawson.

Marc G. Kurzman, Minneapolis, Minn., for Greg and Jane Myers and Donald and Cindy Buchan.

James W. Kenney, St. Paul, Minn., for Michael Shea and Michael Shea & Assoc.

Phillip A. Cole, Minneapolis, Minn., for Thomsen.

Robert H. Lynn, Minneapolis, Minn., for Norring.

John M. Degnan, Minneapolis, Minn., for Johnson and Manahan.

Before ROSS, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and ARNOLD, Circuit Judge.

ROSS, Circuit Judge.

Before us are the consolidated appeals in eight civil rights lawsuits which grew out of a child sexual abuse investigation in Jordan, Minnesota, during 1983–84. Thirteen of the fifteen plaintiffs in these cases were charged by Scott County Attorney, R. Kathleen Morris, with criminal sexual activity involving one or more minor children.

The investigation began in September 1983 with the arrest of James Rud, a per-

son who later entered a plea of guilty to multiple counts of child sexual abuse. Thirteen of the plaintiffs in these cases were arrested and charged between January 11, 1984, and June 4, 1984. Where minor children were residing in the home, they were removed on temporary police holds after a parent's arrest and subsequently placed in foster care. The two plaintiffs who were never charged nevertheless lost temporary custody of their children.

One criminal case involving two of the plaintiffs in these appeals went to trial, and the County lost. Upon the acquittal of these plaintiffs, the advice of therapists and guardians that testifying at additional trials would be against the best interests of the juvenile witnesses and the development of an investigation into alleged homicides, the county attorney dismissed all pending charges against the plaintiffs and others. The plaintiffs then filed these civil rights lawsuits against Morris and various other defendants.

**Appealable Orders**

The appeals are from a decision by the district court[1] to deny certain motions for summary judgment and to grant others. All of the defendants, including many who are not before us in these appeals, moved for summary judgment in the district court on the basis of absolute and qualified immunity from suit and other grounds. The district court denied the motions submitted by (1) Scott County Attorney R. Kathleen Morris; (2) Scott County Sheriff Douglas Tietz; (3) four of the sheriff's deputies, Michael Busch, Patrick Morgan, Norm Pint and David Einertson, and (4) a therapist, Susan DeVries. The district court entered summary judgment in favor of (1) Jordan police officer Larry Norring; (2) guardians ad litem Diane Johnson, John Manahan and Paul Thomsen; (3) therapists Thomas Price and Phipps-Yonas & Price, P.A., Michael Shea, Leslie Faricy and Shea & Associates, P.A., and (4) a court-appointed attorney, Wright Walling.

The orders entering summary judgment in favor of the police officer, guardians ad litem, certain therapists and a court-appointed attorney were certified for review under FED.R.CIV.P. 54(b). The appeals by the prosecutor, sheriff, sheriff's deputies and a therapist contesting the denial of their motions for summary judgment are appealable on the basis of the limited exception created in *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2815, 2816, 86 L.Ed.2d 411 (1985), for denials of motions for summary judgment asserting immunity defenses. *See Wright v. South Arkansas Regional Health Center, Inc.*, 800 F.2d 199, 202–03 (8th Cir.1986); *White v. Pierce County*, 797 F.2d 812, 814 (9th Cir.1986).

**The Plaintiffs**

The plaintiffs in these cases came to the attention of law enforcement personnel in the following sequence of events. On September 26, 1983, Chris Brown[2] reported to Larry Norring of the Jordan, Minnesota police department that James Rud, a resident of the Valley Green trailer park in Jordan, Minnesota, had been sexually abusing her daughter, S. Krahl. Then Judy Kath[3] made a complaint concerning Rud's abuse of her daughter, V. Kath. Norring performed a warrantless arrest of Rud on September 26, 1983. Criminal charges were soon brought, and as the investigation continued, additional criminal complaints were filed against Rud, ultimately totalling 108 counts of sexual abuse involving many children. He eventually entered a guilty plea and is serving a term of imprisonment.

After Rud had been arrested and charged and child victims were being questioned, other child victims of Rud were identified and acts of sexual abuse by other adults were described. The magnitude of the job of questioning Rud victims soon exceeded the capacity of the small Jordan police department. By October 1, 1983, Jordan police chief Alvin Erickson requested investigative assistance from the Min-

---

1. *In re Scott County Master Docket,* 618 F.Supp. 1534 (D.Minn.1985), the Honorable Harry H. MacLaughlin, United States District Judge for the District of Minnesota.

2. Christine Brown is not a party to these appeals.

3. Judy Kath is not a party to these appeals.

nesota Bureau of Criminal Apprehension (BCA).

Norring and three BCA officers interviewed children until in early November 1983, the Scott County sheriff's department entered the investigation and the BCA withdrew. Norring was assigned to assist in the investigation, and he maintained investigative contact with S. Krahl and her brother, J. Krahl, and V. Kath (all Rud victims). By the end of November 1983, eight persons had been formally charged including Chris Brown, Judy Kath and Robert Rawson. (Robert Rawson was implicated by two Rud victims as a person who had sexually abused them.) [4]

In interviews with Larry Norring on January 10 and 11, 1984, S. Krahl, J. Krahl and V. Kath described acts of sexual abuse by plaintiffs Tom and Helen Brown. Investigation by law enforcement personnel into James Rud charges was still in progress as of this date. Deputy sheriff Michael Busch swore out criminal complaints incorporating Norring's report of these interviews, on the basis of which Busch obtained arrest warrants. Tom and Helen Brown were arrested on January 11, 1984, by Norring, Busch and deputy sheriff Patrick Morgan. Two minor children, J. Brown and B. Brown, were removed from the home on January 11, 1984.

In interviews with detectives Busch and Morgan on January 12, 13, and 20, 1984, S. Krahl and J. Brown described acts of abuse by plaintiffs Robert and Lois Bentz. Morgan swore out criminal complaints on the basis of these statements and obtained arrest warrants. Robert and Lois Bentz were arrested on January 20, 1984, and their three minor children were removed from the home on that date. The Bentz children were not questioned until after their parents had been arrested.[5]

Another Rud victim, K. Fossen, implicated plaintiff Greg Myers as did J. Brown

and B. Brown. These children described acts of abuse by Myers during interviews on February 6, 1984, with detectives Busch and Morgan. Busch and Morgan performed a warrantless arrest of Greg Myers on February 6, 1984, and deputy sheriffs Norm Pint and David Menden were assigned by deputy sheriff David Einertson to remove three minor children from the Myers' home. Busch swore out a criminal complaint against Greg Myers on February 8, 1984. The two older Myers children were not questioned until after Greg Myers' arrest. The youngest, aged two, was not questioned.

By March 1984, V. Kath (one of the two Rud victims who had previously described sexual abuse upon themselves by Robert Rawson) also stated that Robert Rawson had been abusing his daughter S. Rawson. On March 22, 1984, detectives Busch and Morgan removed S. Rawson from her home over the protests of her mother, plaintiff Coralene Rawson. Within four days a neglect petition was filed based upon statements by S. Rawson to the sheriff's deputies after she had been removed from her home. On March 31, 1984, plaintiff Coralene Rawson was arrested and charged with sexually abusing S. Rawson.

In interviews with detectives Busch and Pint on May 5, 15, and 22, 1984, the two older Myers children implicated plaintiff Jane Myers (their mother) and plaintiffs Charles and Carol Lallak and Duane and Dee Rank. On May 23, 1984, Busch swore out criminal complaints and obtained warrants for the arrest of Jane Myers, the Lallaks and the Ranks, and, with detective Pint, arrested the Lallaks and Ranks. Jane Myers presented herself at the Scott County jail. The Myers children had previously been removed from the home upon the arrest of Greg Myers. The Ranks had no minor children, and the Lallaks' children had been living with relatives outside of

---

**4.** Robert Rawson is not a party to these appeals.

**5.** Additional charges were brought against Robert and Lois Bentz on July 23, 1984, based on interviews with the Bentz children, J. Brown and two victims of James Rud (S. Krahl and K. Fossen). Deputy sheriff Norman Pint was the

complaining witness, and the criminal complaint incorporated statements by the children concerning games of nude hide and seek, sodomy, oral sex and sexual acts involving a cat in which they had been forced by Robert and Lois Bentz to participate.

Jordan since shortly after Greg Myers' arrest.

Donald and Cindy Buchan had sought examination by a physician and interviews with deputy sheriffs for their daughter, M. Buchan, after Greg Myers' arrest. M. Buchan was a close friend of the Myers' daughter, and the Myers had babysat for the Buchan children. Through May 1984, M. Buchan reported no abuse. On May 30, 1984, however, Morris was engaged in trial preparation with the Myers' daughter, A. Myers. A. Myers stated that M. Buchan was her friend and that persons who had hurt M. Buchan were A. Myers' parents and M. Buchan's father (but not mother).

Because Donald Buchan was a Scott County deputy sheriff, the BCA rather than the sheriff's office investigated. On June 4, 1984, Special Agent Patrick Shannon of the BCA participated in interviews with the two older Myers children and M. Buchan, all of whom implicated plaintiffs Donald and Cindy Buchan in acts of sexual abuse. Agent Shannon performed a warrantless arrest of the Buchans on June 4, 1984, and swore out criminal complaints on June 6, 1984.[6] The three minor Buchan children were removed from home on the day of their parents' arrest.

By November 1983, the older son of plaintiffs Daniel and Wanda Meger, and possibly their younger son, had been identified as victims of James Rud. The children were living at home, receiving counselling by Scott County Human Services personnel and being questioned by Scott County authorities. On June 5, 1984, the older child described to detectives Busch and Morgan sexual abuse by Daniel Meger. Both children subsequently told Busch and Morgan about acts of anal penetration with fingers and objects and oral sexual activity performed upon them by both parents. On June 14, 1984, the older child told a physician of sexual abuse by both parents. In July or August 1984, both children described sexual abuse by their parents and a grandmother to a private therapist hired when the parents' attorney requested as-

sessment by a private psychologist in lieu of Scott County Human Services personnel.

When her older son's statements about Daniel Meger were communicated to plaintiff Wanda Meger on June 5, 1984, she signed a document authorizing voluntary placement of the children in foster care. However, she states that she was pressured and misled into signing the agreement. The voluntary placement was rescinded in August 1984, at which time the Scott County Human Services Department filed a neglect petition. The Megers were never arrested or charged.

**Discovery**

After the prosecutor dismissed all outstanding charges, the Minnesota Attorney General's office assumed responsibility both for any additional criminal proceedings which might develop and for the pending proceedings in the Scott County Court, Family Division [family court]. On behalf of the state, the BCA and FBI conducted an intensive investigation into why the criminal charges had been dropped and whether there existed probable cause to bring additional charges of sexual abuse or homicide. These agents recommended to the state Attorney General that no credible evidence existed in support of homicide allegations, and insufficient evidence existed to justify new sexual abuse charges. The Attorney General issued a report entitled *Report on Scott County Investigations*, Hubert H. Humphrey III, Attorney General (Feb. 12, 1985).

In addition, in March 1985, plaintiff Cindy Buchan filed a petition with the Governor of Minnesota seeking the removal of R. Kathleen Morris from office for malfeasance. *See Bush v. Perpich*, 370 N.W.2d 886, 887 (Minn.1985). The governor established a commission which conducted hearings and took testimony, *id.* at 888, including some from parties to these appeals.

Besides the volumes of testimony and other evidence generated by these two investigations, substantial discovery occurred in connection with the criminal proceed-

---

**6.** Agent Shannon is not a party to these appeals.

ings, in particular the trial against Robert and Lois Bentz, and the family court proceedings, in particular the Myers and Buchan trials in 1984–85.

Beyond the discovery developed in connection with the state investigations, criminal proceedings and family court matters, the parties to these civil rights cases submitted affidavits and other materials to the district court in support of and in opposition to the defendants' summary judgment motions. Furthermore, the district court declined to stay discovery pending the outcome of these appeals. Counsel for the Buchan plaintiffs, for example, has asserted in a brief that as of the date when briefs were prepared, "[i]n fact, discovery in this case is virtually completed by court order on February 14, 1986." Matters developed in discovery which had not been presented to the district court were discussed in various briefs, and we issued two orders in April 1986 permitting expansion of the record before us to include these materials as well as additional documents in response to the supplemented record.

As the result of all of this discovery, a massive multi-volume fact-filled record is before us in connection with these appeals. We reject the plaintiffs' assertion that we should now ignore this record and decide these appeals on the basis of the pleadings alone. *See, e.g., Kompare v. Stein,* 801 F.2d 883, 889 (7th Cir.1986), reasoning that in determining immunity issues, it is not necessary to accept as true allegations which are wholly without factual support in a record which contains, among other items, evidence developed at the civil rights plaintiffs' prior criminal trial.

We are aware of our duty to view the facts in the light most favorable to the non-movant, but only *genuine* issues of material fact can defeat a motion for summary judgment. Mere allegations are insufficient to raise a genuine issue. The [plaintiffs] argue for an exception to this rule because the district court limited discovery on the grounds that qualified immunity protects government officials from suit (including discovery), as well as from the payment of monetary damages. The district court's limitation of discovery was proper, particularly because the [plaintiffs] had the opportunity to explore the facts in the previous criminal proceedings.

*Id.* at 886 (emphasis in original).

## The Challenged Conduct

Although phrased in terms of conspiracy, fraud, malice, coercion and violation of constitutional rights and state law, the actual conduct of which the plaintiffs complain amounts to prosecution, handling of evidentiary material, arrest, interrogation of children and separation of parents from children. These acts, plaintiffs assert, caused them to suffer injuries including loss of liberty, loss of employment, emotional distress, alienation of affection between parent and child, injury to reputation and other harms.

The plaintiffs allege that the prosecutor abused the power of her office in the manner in which she initiated or threatened prosecutions, handled evidentiary material and otherwise conducted matters preliminary to and encompassed within the institution of criminal charges. The prosecutor is also alleged to have erroneously advised law enforcement personnel that probable cause existed to arrest various plaintiffs.

The sheriff's deputies allegedly arrested plaintiffs without probable cause and deceived judicial officers as to the reliability of statements by children on which judicial determinations of probable cause were based. The sheriff allegedly failed to intercede to prevent abuses by his deputies and the prosecutor.

The prosecutor, sheriff's deputies, as well as guardians, therapists and a court-appointed attorney are alleged to have interrogated children for an improper purpose (conspiring to elicit fabricated accusations against the plaintiffs) and in an improper manner (using methods so flawed that they inevitably produced false and fabricated accusations).

Various defendants are also alleged to have contributed in one or more ways to

the separation of parents from their children. The sheriff's deputies, for example, removed minor children from their homes on "police holds" pursuant to MINN.STAT. ANN. § 260.165(1)(c)(2) (West 1982) upon the arrest of various plaintiffs. The prosecutor may have approved the summary removal of children from the plaintiffs' custody and certainly approved the initiation of neglect proceedings in the family court. She also induced one plaintiff to sign a voluntary placement agreement. Certain therapists advised the family court against visitation between plaintiffs and children. Guardians allegedly advised in favor of foster care, recommended against parental visitation and refused to divulge the location of foster care placements.

We have examined the claims of immunity and other defenses asserted by each defendant with respect to these acts, and we conclude that each defendant is entitled to summary judgment for the reasons set forth below. Accordingly, we affirm in part and reverse in part and remand for further proceedings consistent with this opinion.

## PROSECUTOR

### Initiating Prosecutions and Handling Evidence

■ All of the plaintiffs have sued Scott County Attorney R. Kathleen Morris for her role in the initiation of criminal proceedings against them and her handling of evidentiary material. They allege variously that she filed or threatened to file criminal complaints against them recklessly, maliciously, fraudulently and without adequate investigation; that she caused the Bentz plaintiffs to endure a criminal trial; that she resisted certain plaintiffs' pretrial release from custody upon reasonable terms; that she entered into a plea bargain with James Rud which was illegal; that she suborned perjury of a major prosecution witness (James Rud) in exchange for plea bargaining concessions; that she made or caused misrepresentations to the court during family court proceedings; that she caused witnesses to give false and unfavorable testimony; that she withheld potentially exculpatory evidence, and that she destroyed two items of evidence.

*Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 994–95, 47 L.Ed.2d 128 (1976) established that a prosecutor is absolutely immune from a suit for damages under 42 U.S.C. § 1983 for alleged civil rights violations committed in "initiating a prosecution and in presenting the State's case." These functions, "intimately associated with the judicial phase of the criminal process," as opposed to investigative "police work" or administrative duties, must be absolutely shielded in the interests of the office, the judicial system and society.[7]

7. *See Imbler v. Pachtman,* 424 U.S. 409, 424–27, 96 S.Ct. 984, 992–93, 47 L.Ed.2d 128 (1976):

If a prosecutor had only a qualified immunity, the threat of § 1983 suits would undermine performance of his duties no less than would the threat of common-law suits for malicious prosecution. A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court. The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages. Such suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate. * * * Further, if the prosecutor could be made to answer in court each time such a person charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law.

\* \* \* \* \* \*

The affording of only a qualified immunity to the prosecutor also could have an adverse effect upon the functioning of the criminal justice system. Attaining the system's goal of accurately determining guilt or innocence requires that both the prosecution and the defense have wide discretion in the conduct of the trial and the presentation of evidence. The veracity of witnesses in criminal cases frequently is subject to doubt before and after they testify * * *. If prosecutors were hampered in exercising their judgment as to the use of such witnesses by concern about resulting personal liability, the triers of fact in criminal cases often would be denied relevant evidence.

The ultimate fairness of the operation of the system itself could be weakened by subjecting

■ Thus a prosecutor does not, in a civil rights action for damages, have to defend prosecutorial mistakes if those mistakes occurred in the performance of a function recognized as inherent in the prosecutor's role as an advocate. Moreover, because the immunity depends not upon the defendant's status as a prosecutor but upon the "functional nature of the activities" of which a plaintiff complains, *id.* at 430, 96 S.Ct. at 994, immunity for performance of inherently prosecutorial functions is not defeated by allegations of improper motivation such as malice, vindictiveness of self-interest. *See, e.g., Wahl v. McIver,* 773 F.2d 1169, 1173 (11th Cir.1985); *Lerwill v. Joslin,* 712 F.2d 435, 441 (10th Cir. 1983). Similarly, allegations of abusive, illegal or unethical conduct must fail if they represent an attempt to impose damages liability for acts encompassed in the initiation or conduct of adversarial proceedings by a prosecutor.

■ Accordingly, the decision to file charges is protected, even in the face of accusations of: vindictive prosecution, *Wahl v. McIver, supra,* 773 F.2d at 1173; or reckless prosecution without adequate investigation, *id.; Glick v. Koenig,* 766 F.2d 265, 269 (7th Cir.1985); *Henzel v. Gerstein,* 608 F.2d 654, 657 (5th Cir.1979); or prosecution without jurisdiction, *Wahl v. McIver, supra,* 773 F.2d at 1173; *Lerwill v. Joslin, supra,* 712 F.2d at 438 (even if with malice); or conspiracy to prosecute for a crime that never occurred, *Rachuy v. Murphy Motor Freight Lines, Inc.,* 663 F.2d 57, 58 (8th Cir.1981). Similarly, threatening criminal prosecution is within the scope of absolute immunity. *Goldschmidt v. Patchett,* 686 F.2d 582, 585 (7th Cir.1982); *Henzel v. Gerstein, supra,* 608 F.2d at 657.

■ Other acts encompassed within the protected function of initiating a case include instituting the termination of parental rights even if allegedly without notice to the parent, *Martin v. Aubuchon,* 623 F.2d 1282, 1285 (8th Cir.1980); procuring a warrant for the arrest of a charged defendant, *Lerwill v. Joslin, supra,* 712 F.2d at 438, and advocating a particular level of bail, *id.* at 438, 439. A "prosecutor's activities in the plea bargaining context" warrant absolute immunity, *Taylor v. Kavanagh,* 640 F.2d 450, 453 (2d Cir.1981) (despite alleged misrepresentations). *Cf. McGruder v. Necaise,* 733 F.2d 1146, 1148 (5th Cir.1984) (claim alleging efforts to intimidate a civil rights plaintiff into dismissing a damages suit in exchange for dismissal of criminal charges held barred by absolute immunity because "[t]he decision to initiate, maintain, or dismiss criminal charges is at the core of the prosecutorial function.").

■ As for the handling of evidentiary material, allegations that a prosecutor knowingly offered, used or presented false, misleading or perjured testimony at trial or before a grand jury do not defeat absolute prosecutorial immunity, regardless of how reprehensible such conduct would be if it occurred. *Imbler v. Pachtman, supra,* 424 U.S. at 413, 416, 431, 96 S.Ct. at 986, 988, 995; *Jones v. Shankland,* 800 F.2d 77, 80 (6th Cir.1986); *Morrison v. City of Baton Rouge,* 761 F.2d 242, 248 (5th Cir.1985) (even if with malice); *Fullman v. Graddick,* 739 F.2d 553, 559 (11th Cir.1984).

The same is true for allegations of withholding or suppressing exculpatory evidence. *Imbler v. Pachtman, supra,* 424 U.S. at 413, 416, 431, 96 S.Ct. at 986, 988, 995; *White v. Murphy,* 789 F.2d 614, 615–16 (8th Cir.1986) (conspiracy to conceal an unlawful arrest and suppress favorable evidence); *Campbell v. Maine,* 787 F.2d 776, 777–78 (1st Cir.1986) (conspiracy to frame the complainant and failure to disclose exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)); *Fullman v. Graddick, supra,* 739 F.2d at 559 (conspiracy to with-

---

prosecutors to § 1983 liability. Various post-trial procedures are available to determine whether an accused has received a fair trial. * * * [Their] focus should not be blurred by even the subconscious knowledge that a post-

trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistaken judgment.

hold material evidence helpful to the defense); *Henzel v. Gerstein, supra,* 608 F.2d at 657 (suppressing exculpatory evidence).

Forcing a witness to testify and securing the attendance of witnesses "is associated with the judicial process and * * * any claim against a prosecutor arising from that activity is barred by absolute immunity." *Hamilton v. Daley,* 777 F.2d 1207, 1213 (7th Cir.1985) (despite allegations that the prosecutor knew the testimony to be given would be false). Soliciting and suborning perjured testimony does not create liability in damages for a prosecutor "acting as an advocate in a judicial proceeding." *Taylor v. Kavanagh, supra,* 640 F.2d at 452. *Accord Rachuy v. Murphy Motor Freight Lines, supra,* 663 F.2d at 58 (fabricating evidence); *Lee v. Willins,* 617 F.2d 320, 322 (2d Cir.), *cert. denied,* 449 U.S. 861, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980) (subjecting the complainant to the ordeal of criminal trial by allegedly falsifying evidence and coercing perjured testimony).

In short, with the possible exception of the alleged destruction of evidence, all of the previously enumerated claims against Morris are barred by absolute prosecutorial immunity, because they represent an effort to impose liability for her role in initiating adversarial proceedings and presenting the prosecutor's case. On the basis of the foregoing authorities and the reasons for the immunity as discussed in *Imbler v. Pachtman, supra,* 424 U.S. at 424–27, 96 S.Ct. at 992–93, Morris is entitled to summary judgment as to these claims and allegations.

**Destruction of Evidence**

■ As for the two items of evidence which were destroyed, the first was R. Kathleen Morris' 1984 appointments calendar.[8] The calendar is alleged to have sig-

nificance with respect to two issues: (1) the earliest date at which Morris became actively involved in the events giving rise to these lawsuits and (2) the frequency of her contacts with children.

The plaintiffs assert that Morris, acting as an investigator, became actively involved in ferreting out candidates for prosecution in November 1983. They rely on a statement attributed to Jordan police officer Larry Norring by FBI agent Robert Erwin after an interview between the two on December 19, 1984. Norring is quoted by Erwin as stating that Morris "got actively involved in the investigation around November 1983." In the same report, however, Norring is quoted as saying that Morris or her staff began interviewing children in the spring (of 1984). Morris identified the date at which she began interviewing children as February 1984.

Since the calendar was for 1984, it could not have been used to establish Morris' activities in November 1983. The calendar therefore is without evidentiary significance with respect to the issue of whether Morris' initial involvement began in 1983.

The next issue on which the calendar might have had some relevance was the frequency of Morris' contacts with the children during 1984. The central theory of the plaintiffs' claims is that the children were questioned by a great many people including Morris, law enforcement officers, health professionals and others, all participating in a conspiracy to elicit fabricated accusations against the plaintiffs.

Morris, while denying conspiracy, does not deny that the children were questioned extensively by many people. Nor does she place any specific numerical limit or estimate on the number of overall contacts she had with suspected victims. Thus the calendar, if we accept the plaintiffs' character-

---

**8.** Morris contends that the calendar was discarded in a routine fashion in November 1984 when she received her new calendar for 1985 (which included the month of December 1984). However, on November 20, 1984, the Lallaks served Morris with a proposed nondestruct order attached to their civil rights complaint. The

order directed preservation of "calendars" among other "documents". While the proposed nondestruct order was not signed by a magistrate until December 10, 1984, Morris had been placed on notice that the Lallaks were seeking access to the calendar.

ization of its contents as true, at most might have served to corroborate the uncontradicted assertion that Morris frequently interviewed children. We therefore perceive no constitutional significance in the destruction of the 1984 calendar.

The other item of evidence which Morris is alleged to have destroyed was a videotape of an interview with the two older Myers children taped at the St. Lawrence State Park Quarry Campgrounds where various children indicated acts of abuse had occurred. There is a conflict in the record concerning whether the tape contained evidence favorable to the plaintiffs. However, the record contains four unrebutted affidavits that Morris had nothing to do with making or destroying the tape.

Detective Pint's affidavit asserts that on May 22, 1984, he determined "without any instructions or requests from the county attorney's office" to videotape an interview at the Quarry Campgrounds with the two children. He taped the interview in the presence of detective Busch, guardian ad litem Paul Thomsen and therapist Tom Price. When he determined that the audio and visual quality of the tape was too poor for subsequent use, he taped over it on May 29, 1984, in a subsequent visit to the campgrounds without the children. According to Pint, Morris "did not give [Pint] any instructions concerning the preservation or erasure of the tape." Nor to his knowledge did Morris ever see the tape.

Detective Busch's affidavit asserts that "Kathleen Morris did not, to [Busch's] knowledge, see the tape and, to [Busch's] knowledge, did not order or request that it be erased." Detective Einertson had general supervisory authority over detectives Pint, Busch and Morgan during the investigation. Einertson's affidavit states that he never viewed the tape and that he "never received any requests for such a videotape from Kathleen Morris nor did he ever receive any instructions from her to destroy or erase such tapes as may have been made." Morris states by affidavit that she "at no time viewed the videotape and did

not advise or instruct anyone to erase or otherwise destroy its contents."

Plaintiffs point to no evidence at all to the contrary. At this stage in these proceedings we are searching for genuine issues of material fact. An unsupported allegation that Morris was responsible for the tape's destruction may not proceed to trial on a record which contains no more than bare allegations that the four affiants testifying to the contrary are lying. Because we find no constitutional significance in the destruction of the calendar and no support for Morris' alleged involvement in the erasure of the videotape, we need not decide whether we agree with the Seventh Circuit that allegations of destruction of evidence by a prosecutor are barred by absolute immunity. *See Heidelberg v. Hammer,* 577 F.2d 429, 432 (7th Cir.1978).

### Arrests

■ R. Kathleen Morris had no direct role in procuring or executing arrest warrants or performing warrantless arrests. However, she did advise officer Norring and deputies Busch, Morgan and Pint that in her opinion facts related to her constituted probable cause to arrest and charge the plaintiffs. Her opinions in this respect certainly contributed causally to the plaintiffs' arrests. We hold that in providing advice to law enforcement officials concerning the existence of probable cause and the prospective legality of arrests, Morris was functioning in a quasi-judicial capacity as a prosecutor initiating the formal judicial process. *Cf. Henderson v. Lopez,* 790 F.2d 44 (7th Cir.1986) (absolute immunity shields county attorney for function of advising county officials of the legality of detaining the plaintiff in jail). She therefore has absolute immunity from suit for her performance of this function.

### Questioning Children

■ All of the plaintiffs have sued R. Kathleen Morris for her role in questioning children. We conclude that she has absolute immunity for this function in the circumstances of these cases.

*Imbler v. Pachtman, supra,* 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33, recognized that in some circumstances, obtaining, reviewing and evaluating evidence may serve as a necessary and integral part of the quasi-judicial functions of initiating a prosecution or presenting the government's case.

> *We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.* A prosecuting attorney is required constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. *Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.* At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them.

(Emphasis added.)

At least six federal circuit courts have recognized that not all interrogation of witnesses or securing of evidence by other means is necessarily investigative "police work" when performed by a prosecutor. Each of these courts has recognized circumstances in which a prosecutor's fact-finding, interrogation or other evidence-gathering function was so inherent in the decision whether to initiate a prosecution or in the preparation necessary to present a case that absolute immunity was appropriate for that function in those circumstances.

In *Forsyth v. Kleindienst,* 599 F.2d 1203 (3d Cir.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981), a decision related to *Mitchell v. Forsyth, supra,* the Third Circuit considered evidence-gathering an advocatory rather than investigative or administrative function to the extent that securing additional information is essential to facilitate the decision whether to initiate prosecution.

> We recognize that the decision of the Attorney General, or a prosecuting attorney, to initiate a prosecution is not made in a vacuum. *On occasion, the securing of additional information may be necessary before an informed decision can be made.* To grant a prosecuting attorney absolute immunity over his decision to initiate a prosecution while subjecting him to liability for securing the information necessary to make that decision would only foster uninformed decision-making and the potential for needless actions. *We believe that the right to make the decision without being subject to suit must include some limited right to gather necessary information.* At the same time, we are sensitive to the possibility that this narrow exception could be distorted to include all of a prosecutor's investigative activities. *We hold only that to the extent that the securing of information is necessary to a prosecutor's decision to initiate a criminal prosecution, it is encompassed within the protected, quasi-judicial immunity afforded to the decision itself.*

*Id.* at 1215 (emphasis added).[9]

The plaintiffs' grievance with respect to Morris' role in questioning children is that

---

**9.** The Third Circuit remanded the *Forsyth* case to the district court for the following determination:

> [I]f the decision to authorize the wiretaps was made by the Attorney General in an attempt to secure information to determine whether to initiate a criminal prosecution, then he is

entitled to absolute immunity from suit challenging that decision. Without a statement of the district court's analysis, we are unable to determine whether the Attorney General's conduct meets that test.

*Forsyth v. Kleindienst,* 599 F.2d 1203, 1216 (3d Cir.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct.

she allegedly used the interviews to coerce perjured statements from young and vulnerable witnesses. The Ninth, Second and Seventh Circuits have addressed similar claims concerning prosecutors who allegedly coerced or induced false testimony from witnesses, finding these allegations barred by absolute immunity. *See, e.g., Demery v. Kupperman*, 735 F.2d 1139 (9th Cir.1984), *cert. denied*, 469 U.S. 1127, 105 S.Ct. 810, 83 L.Ed.2d 803 (1985), concluding that when conferring with potential witnesses is for the purpose of deciding whether to file a charge, the interrogation function shares in the absolute prosecutorial immunity for initiating criminal proceedings.

> We think that conferring with potential witnesses for the purpose of determining whether to initiate proceedings is plainly a function "intimately associated with the judicial phase of the criminal process," * * * and is therefore a quasi-judicial function "to which the reasons for absolute immunity apply with full force."

*Id.* at 1144 (citation omitted). *Accord Lee v. Willins, supra*, 617 F.2d at 322, reasoning that the injuries which flow from coercion of false testimony, i.e., trial and imprisonment, are the same injuries which result from the decision to prosecute, and *Imbler v. Pachtman* absolutely shields a prosecutor from having to answer in damages for injuries flowing from the initiation of criminal proceedings. *See also Heidelberg v. Hammer, supra*, 577 F.2d at 432 ("[C]harges that the prosecutors induced witnesses to commit perjury are barred by the immunity doctrine.").

In addition, some investigative case preparation can be regarded as an integral component of case presentation. In *Atkins v. Lanning*, 556 F.2d 485 (10th Cir.1977), for example, a prosecutor was engaged in initiating criminal proceedings against a large group of drug distributors. As part of an ongoing investigation leading to the identification of additional participants in the

scheme, "the district attorney unfortunately caught appellant in the general dragnet," *id.* at 487. The Tenth Circuit decided that absolute immunity attended the prosecutor's acts because the function being performed was "preparing and presenting a case," *id.* at 488.

> Some leeway is needed to perform the function of assembling the state's case. * * * While it is true that some investigative work is necessarily a prerequisite to the preparation of a prosecuting attorney's case, this does not automatically change the nature of his function to resemble that of a police officer.

*Id.* (citations omitted.) *See also Demery v. Kupperman, supra*, 735 F.2d at 1144, reasoning that "conferring with potential witnesses regarding their knowledge of underlying events is plainly part of a prosecutor's preparation of his case" and therefore immune. *Cf. Cook v. Houston Post*, 616 F.2d 791, 793 (5th Cir.1980), with regard to a prosecutor interviewing witnesses before presenting their testimony to a grand jury: "Not all of an advocate's work is done in the courtroom. For a lawyer to properly try a case, he must confer with witnesses, and conduct some of his own factual investigation."

In Morris' circumstances, all functions of which the plaintiffs complain post-dated the filing of criminal charges against James Rud. It soon became clear that Rud had engaged in criminal activity with others, but the number of culpable persons was not known in the fall and winter of 1983–84.

As known or suspected victims were interviewed, they described abuse by other adults and identified other child victims. Some of the information emerging from these interviews was already known to law enforcement personnel, and some was new. In part, because much of the sexual contact described by the children took the form of "games" involving groups of adults and

---

3147, 69 L.Ed.2d 997 (1981). On remand, the Attorney General who had ordered the wiretaps expressly denied that the surveillance had been intended to facilitate an advocatory decision, as

the Supreme Court noted in *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2810, 86 L.Ed.2d 411 (1985).

children, new information was revealed along with merely corroborative material in various interviews.

█ In our view, when a victim during questioning regarding a crime committed by one person indicates that others participated, the prosecutor's role in determining the complicity of others is necessary to the function of deciding whether to initiate additional criminal proceedings. The prosecutor in the Scott County cases had an ongoing responsibility to evaluate whether probable cause existed to charge additional persons with the abuse of previously identified victims (e.g., Browns, Bentzes, Myerses, Rawson, Lallaks, Ranks, Buchans, Megers) as well as to determine whether cause existed to charge previously identified perpetrators with victimizing additional children (e.g., Rud, Bentzes, Lallaks).

The plaintiffs' connection with these cases grew out of the James Rud prosecution in the sense that nine of the plaintiffs, Tom and Helen Brown, Robert and Lois Bentz, Greg Myers, Daniel and Wanda Meger and Charles and Carol Lallak, were all incriminated by Rud victims (among others) in interviews after the initiation of criminal proceedings against James Rud. Coralene Rawson was implicated by her daughter who had by then been identified as a victim of Robert Rawson. Robert Rawson had previously been arrested as a participant in sexual activities involving James Rud. After the arrest of Greg Myers (largely on the testimony of a Rud victim), his children implicated Jane Myers, Duane and Dee Rank and Donald and Cindy Buchan and added additional incrimina-

ting information regarding Charles and Carol Lallak. Thus only the prosecution of Jane Myers, the Ranks, and the Buchans lacked a direct connection to conferences with victims of James Rud.[10]

In addition, by May 1984, Morris was preparing for trials expected to begin in the summer of 1984. She engaged in court preparation sessions involving the review of witnesses' statements and the introduction of various prospective witnesses to the courtroom setting. From a chronological viewpoint, there was no point between the arrest and filing of charges against James Rud in September 1983 and the dismissal of charges against the other defendants in October 1984 when Morris was not either deciding whether to prosecute persons who had been accused or preparing for trial of persons who had been charged, or both.

In these circumstances, we conclude that Morris is absolutely immune from having to defend her role in the interviewing of children. Such involvement as she had in the questioning of children was an integral part of her advocatory functions, i.e., her ongoing prosecutorial responsibilities to decide whom to charge and to prepare for the presentation of her cases.

**Separation of Parents From Children**

█ As for the separation of the Brown, Bentz, Myers, Buchan, Rawson and Meger plaintiffs from their children, a member of Morris' staff initiated the neglect proceedings in family court on behalf of the Scott County Human Services Department. Morris signed and approved the neglect petitions.

**10.** The impression created by the pleadings is that the goal of the investigation was to induce children to incriminate their own parents. However, with the exception of Jane Myers, Coralene Rawson and the Buchans, the plaintiffs were not arrested on the basis of any information obtained from their own children. The interviews in which the Myers children and S. Rawson implicated their mothers occurred well after the arrests of their fathers. (The Myers children were not interviewed at all until after their father's arrest.) M. Buchan was questioned by BCA Agent Shannon only after two of the Myers children had described her as a victim of their own parents and hers. The Bentz children were not interviewed until after their parents' arrest for crimes described by other children. The record does not indicate when the Brown children were first interviewed, but the arrests of Tom and Helen Brown were based on statements by other children. The Ranks had no minor children. The Lallak children resided elsewhere after the arrest of Greg Myers, and the Lallaks' arrest had no connection with any interrogation of their own children. The Megers, who were never arrested, had consented to interviews when their children were identified as Rud victims by November 1983.

This court has previously held a county attorney absolutely immune for the function of initiating juvenile dependency and neglect proceedings. *Martin v. Aubuchon, supra,* 623 F.2d at 1285. *See also Walden v. Wishengrad,* 745 F.2d 149, 152 (2d Cir.1984) (attorney for county department of social services has absolute immunity for the initiation of child protective litigation). *Cf. Mazor v. Shelton,* 637 F.Supp. 330, 334–35 (N.D.Cal.1986) (role of social worker in filing proceedings to protect abused minors is functionally comparable to prosecutor's initiation of the judicial process, thus warranting absolute immunity). Morris has absolute immunity for damage claims arising from this function.[11]

## CONSPIRACY

 Despite Morris' absolute immunity for her prosecutorial functions, those who allegedly conspired with her do not share her immunity. We therefore examine the allegations that the actions of the other defendants which contributed to the arrest of the plaintiffs, accusations against them and separation from their children were performed not for legitimate purposes but as part of a conspiracy to violate the plaintiffs' civil rights.

The heart of the plaintiffs' case is their position that the children's accounts of sexual abuse were false and the prosecutor, sheriff, sheriff's deputies, guardians, therapists, a court-appointed attorney, and a police officer conspired among themselves and with others[12] to extract fabricated accusations from children in order to target the plaintiffs for prosecution. The alleged purpose of the conspiracy was to invent a "sex ring" as part of a publicity campaign against child abuse and incest undertaken by the conspirators in order to advance the career of the prosecutor.

In *Wright v. South Arkansas Regional Health Center, Inc., supra,* 800 F.2d at 202–05, we addressed a claim that for constitutionally impermissible purposes a state employee initiated an investigation and reported false accusations of crime to criminal justice authorities. The alleged motive for the investigation and fabricated accusations in *Wright* was to retaliate for the plaintiff's prior exercise of first amendment rights and to convert the investigative process into a forum for the aggrandizement of the defendant's career (" * * * to get [the plaintiff] out of his hair and make a big name for [the defendant]," *id.* at 204). The actual conduct in *Wright,* investigating and reporting criminal activity, if not distorted by impermissible motives, was lawful, and the defendant of course denied knowledge or belief that any information he had provided to authorities was false.

This court therefore had to consider whether an assertion of qualified immunity could be defeated by the charge that facially legitimate investigative and reporting functions had in reality been corrupted into a strategem for the ventilation of false accusations. In *Wright* as in the Scott County cases, a record had been created, and we examined the record for facts and inferences which, viewed in the plaintiff's favor, would create a genuine issue of improper purpose. The same inquiry is appropriate here.

Other than the Lallaks' claim that officer Norring personally disliked them and Greg Myers, no motive beyond a collective intent to advance the prosecutor's career through publicity is even alleged in the Scott County cases. There is no inference in the

---

11. Prior to the filing of neglect petitions, however, Morris may have taken other steps contributing to the separation of parents and children. As an example, she may have approved or directed the removal of children from their homes upon the arrest of one or both parents. In this regard, *see* the discussion of qualified immunity for this function *infra* with respect to the sheriff's deputies.

12. Additional alleged conspirators variously include social workers, Scott County Human Services Department personnel, officials of Jordan, Minnesota, and others who are not before us in these appeals.

pleadings, record or even briefs that Morris, the sheriff and his deputies or the other alleged conspirators (except for Norring) had the slightest interest in targeting these particular plaintiffs for any personal motives. Even acquaintance is not alleged except for the previous working relationship between Donald Buchan and the sheriff's department and Norring's connection with Greg Myers and the Lallaks. Why this diverse group of personalities and offices should have cooperated with each other in a scheme to advance R. Kathleen Morris' career is clarified nowhere in the pleadings, record or briefs. Moreover, the record contains evidence wholly inconsistent with this allegation of common purpose. Specifically the record strongly suggests that the investigative effort was riddled with personality conflicts and jurisdictional frictions among, for example, the prosecutor and the sheriff, the sheriff and the Jordan police chief, and even the sheriff and the BCA.[13]

As for the guardians, therapists and court-appointed attorney, most of the injuries which these persons allegedly conspired with others to inflict preceded their employment and any involvement in these cases. Like the other defendants, these private parties are alleged to have conspired with Morris and others to arrest the plaintiffs, separate them from their children and coerce fabricated accusations, all as part of a conspiracy to invent a sex ring.

However, none of the defendant guardians and therapists in these appeals (or the attorney for S. Rawson) was employed to assist a child until after that child had already been removed from home upon the arrest of one or both parents, and the family court had determined that a juvenile protection matter existed. Custody of each such child was by then in the family court, and the child was living in foster care.

The acts which these persons performed, attending court appearances, making recommendations to the family court, questioning children about their version of events and reporting statements and opinions concerning abuse were expressly or implicitly within their professional duties. The family court expressly authorized the guardians, for example, to participate in interviews between wards and law enforcement personnel. The plaintiffs attack various decisions by the guardians, therapists and attorney, for example to recommend against visitation, as proof of conspiratorial purpose. In essence, they contend that the performance of their duties by these professionals was directed and tainted by a conspiratorial purpose to frame the plaintiffs.

As in *Wright, id.* at 204, we conclude that the plaintiffs' assertions of conspiratorial purpose amount to no more than unsupported allegations of malice. *See Ashelman v. Pope*, 793 F.2d 1072, 1078 (9th Cir.1986) ("[A]llegations that a conspiracy produced a certain decision should no more pierce the actor's immunity than allegations of bad faith, personal interest or outright malevolence."). We think that more than the mere recitation of an improper state of mind such as malice, bad faith, retaliatory motive or conspiracy is required to defeat qualified immunity for conduct which, absent that state of mind, would be constitutionally acceptable or protected by immunity.

We therefore decide that a conclusory and unsupported allegation of conspiratorial purpose fails to defeat an assertion of qualified immunity by a defendant otherwise entitled to that defense. We conclude, in addition, that the pleadings and record are deficient to create a triable issue

---

**13.** Also inconsistent with the conspiracy claim is the fact that while the plaintiffs allege a conspiracy among the defendants to extract fabricated accusations from children, they make no effort to account for similar accusations from nonconspirators. Both Daniel and Wanda Meger, for example, reported that their sons had told them of acts of sexual abuse by Charles and

Carol Lallak. Similarly, the youngest Myers child, a two year old boy, was not questioned. However, an examination by a pediatrician revealed physical evidence which in the physician's opinion was consistent with, although not conclusive evidence of, a history of anal sexual penetration.

as to the participation by any of the defendants in these appeals in a conspiracy to violate the plaintiffs' civil rights.

Many people believed that children had been abused by the plaintiffs. Within the realm of their various professional responsibilities, they acted upon that belief. A commonly held belief that a crime has been committed is not a conspiracy. Various people engaged in investigating and reporting suspected criminal activity does not amount to conspiracy. We look for a genuine factual issue of concerted activity toward an unlawful objective. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970) (to create a genuine issue of conspiracy, plaintiffs had to point to at least some facts which would suggest that the defendants "reached an understanding" to violate their rights). *See also Deck v. Leftridge*, 771 F.2d 1168, 1170 (8th Cir.1985) ("allegations of a conspiracy must be pleaded with sufficient specificity and factual support to suggest a 'meeting of the minds' [directed] 'toward an unconstitutional action * * *.'") (citations omitted).

We have found inadequate record support to create a genuine issue of concerted activity directed at a common goal to achieve an unlawful purpose. Therefore, the pleading deficiencies and lack of evidence of substance sufficient to create a submissible issue of fact require the dismissal of the plaintiffs' conspiracy claims. Next we examine the defendants' conduct to determine whether, in the absence of a conspiracy, the conduct itself violated clearly established constitutional norms.

## DEPUTY SHERIFFS

### Arrests

 Detectives Busch, Morgan and Pint are defendants in the Bentz, Myers, Lallak and Buchan cases. Detectives Busch and Morgan are also defendants in the Meger case. Busch was the criminal complainant and an arresting officer in the Myers and Lallak cases. Morgan was the criminal complainant in the Bentz case and an arresting officer in the Myers and Lallak cases. Pint was the criminal complainant in July 1984 when additional charges were filed against the Bentz plaintiffs on information received from K. Fossen, S. Krahl, J. Brown, and the Bentz children. Other than their role in seeking and performing arrests, the deputies have been sued for their conduct in interviewing various children and contributing to the separation of plaintiffs from their children.

The allegations against detectives Busch, Morgan and Pint amount to the following: (1) that they sought arrest warrants, swore out criminal complaints and performed arrests without probable cause, (2) that they deceived the judicial officers who found probable cause, (3) that they used improper questioning techniques in interrogating minor witnesses and (4) that they caused the separation of parents and children. We first address the issues of arrest without probable cause and deception of judicial officers.

MINN.STAT.ANN. § 609.342(1)(a) (West 1964 and Supp.1987) defines as criminal sexual conduct in the first degree "sexual penetration with another [if] the complainant is under 13 years of age and the actor is more than 36 months older than the complainant." Section 609.343(1)(a) defines as criminal sexual contact in the second degree "sexual contact with another person [if] the complainant is under 13 years of age and the actor is more than 36 months older than the complainant" even if the sexual contact was not coerced. Section 609.05 imposes criminal liability on one who intentionally aids, conspires with or procures the other to commit a crime. Plaintiffs Robert and Lois Bentz, Greg and Jane Myers and Charles and Carol Lallak assert that the deputies lacked probable cause to arrest them for commission of these offenses.

Probable cause "is a reasonable ground for belief of guilt." It means "less than evidence which would justify * * * conviction [but] more than bare suspicion."

Probable cause exists where "the facts and circumstances within their [the offi-

cers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.

*Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949) (citations omitted).

In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*Id.* at 175, 69 S.Ct. at 1310. *See also Hannah v. City of Overland,* 795 F.2d 1385, 1389 (8th Cir.1986):

This Court often has addressed the issue of probable cause. We previously have stated that

[i]n determining whether probable cause exists to make a warrantless arrest, a court will consider whether the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed ... an offense. Probable cause is to be assessed in terms of the circumstances confronting a reasonably cautious police officer at the time of the arrest, and the arresting officer is entitled to consider the circumstances, including arguably innocent conduct, in light of his training and experience. "[T]he probability, and not a prima facie showing, of criminal activity is the standard of probable cause."

(Citations omitted.)

Plaintiffs assert that the existence of probable cause for their arrests is a factual determination which should be made in the first instance by the district court. They contend that the only function of this court in the context of the present appeals is to determine whether the fourth amendment right to be free from arrest without probable cause was clearly established, which of course it was, when the plaintiffs were arrested. Therefore, plaintiffs reason, because the right to be free from arrest based on less than probable cause was clearly established in 1984, these cases should be remanded for trial on the merits concerning whether probable cause existed in fact for the arrests.

We think that this argument misconstrues the nature of the inquiry we are required to make on appeal from the denial of a pretrial motion asserting qualified immunity for the function of procuring and making arrests. The issue for immunity purposes is not probable cause in fact but "arguable" probable cause. *Floyd v. Farrell,* 765 F.2d 1, 5 (1st Cir.1985) ("[S]eeking an arrest warrant is 'objectively reasonable' so long as the presence of probable cause is at least arguable. * * * We think this rule can be extended to warrantless arrests as well * * *.").

*Malley v. Briggs,* —— U.S. ——, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) indicates that an officer requesting an arrest warrant will be shielded by qualified immunity for that function unless judged on an objective basis, "no officer of reasonable competence would have requested the warrant." *Id.* at 1099 n. 9. "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable * * * will the shield of immunity be lost." *Id.* at 1098.

Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but *if officers of reasonable competence could disagree on this issue, immunity should be recognized.*

*Id.* at 1096 (emphasis added). We therefore review the information before the deputy sheriffs when they swore out criminal complaints and performed arrests to determine whether no reasonably competent officer would have sought to arrest the Bentz, Myers and Lallak plaintiffs on the basis of the known facts and circumstances.

Robert and Lois Bentz were arrested on January 20, 1984, on the basis of accounts

by two ten year old children (interviewed separately) who had not been in contact with each other for a month or more. The parents of one of the children, neighbors of the Bentz family, had been arrested nine days previously. Therefore, that child had not, as alleged, been "isolated and confined" for a prolonged period in foster care before making the statements which incriminated the Bentzes. Both children, in accounts that were consistent with each other and not identical, explicitly described "hide and seek" games at the Bentz residence in which children were required to perform and submit to acts of oral sex with Robert and Lois Bentz. Other children previously interviewed had named the Bentz children as victims of abuse by other adults.

The arrest of Greg Myers was based upon statements provided by three children. One, a twelve year old girl, had been interviewed only once before by law enforcement personnel and was living at home with her parents. She had previously been identified by other children as a victim of sexual involvement with adults and children. These circumstances and the absence of any known reason why she would fabricate accusations against anyone are circumstances recounted by detective Busch to establish her reliability. Her mother was within hearing distance of the interview in which this child implicated Greg Myers (and others). This child described games of hide and seek, tag and musical baseball in which sexual activity between adults and children figured prominently, and she identified Greg Myers by name and as a policeman with the Jordan police department.

The other two informants, the nine and ten year old children of plaintiffs Tom and Helen Brown, described incidents at the Quarry Campgrounds. The Brown children had been placed in foster care and were not living in the third child's neighborhood at the time of their statements. One of the Browns' children described an assault on himself by Greg Myers in Myers' truck which the child described as a Chevrolet, 4 X 4 green pickup with a snow-plow and camper. After the warrantless arrest of Greg Myers but before detective Busch swore out a criminal complaint on February 8, 1984, Myers admitted being present at the campgrounds in the time frame described by the Browns' children and acknowledged the presence there of the Browns' children during that period. He also acknowledged that he had driven a green, 4 X 4 Chevrolet pickup truck with a white camper to the campgrounds.

Jane Myers and Charles and Carol Lallak were arrested on the basis of statements made by the two older Myers children, then twelve and five years old, on three occasions in May 1984. They described incidents at the Quarry Campgrounds where Greg Myers and three other children had already indicated the presence of the Myers family during the time frame described. The incidents, some involving group kinds of sexual activity, were described with specificity. In addition, other children had previously implicated the Lallaks, i.e., a child of Chris Brown and a son of Daniel and Wanda Meger. Greg Myers had by then failed two polygraph tests on the issue of sexual contact with children, lending credibility to the accounts by his own children of sexual abuse by Greg Myers in conjunction with others.

These accounts were not hearsay or anonymous tips, but were detailed descriptions of criminal activity by suspected victim-eyewitnesses whose names and ages were known to the deputies and were provided to the judicial officers who also found probable cause. In no case did an arrest occur on the basis of only one child's account, although in Minnesota, to support a prosecution for sexual abuse of a child, the testimony of a juvenile victim need not be corroborated. *See* MINN.STAT.ANN. § 609.347(1) (Supp.1987) in effect in 1984. As for the suggestion that the age and particular vulnerabilities of young children should render their statements less credible, we reject the inference that law enforcement personnel are necessarily less entitled to rely on details of criminal activity described by children than those de-

scribed by adults. In light of the facts and circumstances before the deputies, we conclude that their conduct in seeking and performing the arrests was objectively reasonable. At the very least, officers of reasonable competence could have differed as to probable cause. *Malley v. Briggs, supra,* 106 S.Ct. at 1096.[14]

## Deception of Judicial Officers

■ The Bentz, Myers and Lallak plaintiffs also contend that detectives Busch, Morgan and Pint perpetrated a fraud upon the judicial officers who found probable cause to arrest and charge these plaintiffs. The essence of the alleged deception was the representation that the child informants were reliable and their statements credible.

If the allegations of judicial deception represent an attempt to hold the officers accountable for some subjective state of mind such as malice, bad faith or improper motivation, such claims are barred by qualified immunity if the conduct (procuring and making arrests) was objectively reasonable, as we have held that it was. *See Malley v. Briggs, supra,* 106 S.Ct. at 1096: "Under the *Harlow* standard * * * an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *See also Floyd v. Farrell, supra,* 765 F.2d at 6 (evidence that the true motive for the plaintiff's arrest was malice, rather than the arresting officer's bona fide belief that probable cause existed, is irrelevant to a qualified immunity defense if, viewed objectively, an officer in the same circumstances could reasonably have believed he had probable cause). "The objective focus of the *Harlow* test precludes us from undercutting [a] finding of objectively reasonable belief with inquiries into actual motives or beliefs." *Id. Accord Hannah v. City of Overland, supra,* 795 F.2d at 1390 ("If there was probable cause to arrest [plaintiff], based on an objective reasonableness standard, the sub-

jective motivations of the arresting police officers are irrelevant.").

Construed liberally, the allegations of judicial deception may state a claim that the deputies deliberately or recklessly incorporated known falsehoods into their reports, criminal complaints and warrant applications. If this claim were true, then the deputies' sworn representations as to the existence of probable cause would be perjury or close to it, and perjury is not objectively reasonable conduct. "Where the judicial finding of probable cause is based solely on information the officer knew to be false or would have known was false had he not recklessly disregarded the truth, not only does the arrest violate the fourth amendment, but the officer will not be entitled to good faith immunity." *Olson v. Tyler,* 771 F.2d 277, 282 (7th Cir.1985).

However, a substantial preliminary showing of dishonesty is necessary to obtain even an evidentiary hearing in an attempt to impeach a warrant application which on its face reveals probable cause. "Mere unfounded and unsupported allegations that the warrant was not based on probable cause, but rather upon false statements, and deception are not sufficient to subject officials to the cost and burdens of trial." *Fullman v. Graddick, supra,* 739 F.2d at 562. *Accord Rodgers v. Lincoln Towing Service, Inc.,* 771 F.2d 194, 200–01 (7th Cir.1985) (in the absence of identified facts indicating that an arresting officer knew his informants were lying, the officer was entitled to arrest on the basis of statements establishing probable cause).

In analogous circumstances, the Supreme Court has indicated that bare allegations of misrepresentation do not suffice to undermine the presumption of validity accorded an affidavit supporting a warrant request. *See Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978) (challenge to the veracity of a search warrant affidavit in a criminal proceeding):

---

**14.** The Ninth Circuit was satisfied that the considerably less substantial information available to deputy sheriffs in *White v. Pierce County,* 797 F.2d 812, 815–16 (9th Cir.1986) established probable cause to believe that a child had been abused and could legally be taken into custody.

There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. *To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.* The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.

(Emphasis added.) *Accord United States v. Garcia,* 593 F.2d 77, 79–80 (8th Cir.1979).

The plaintiffs have not even approached this standard of specificity. No facts have been recited which would indicate that any of the deputies actually believed the plaintiffs were innocent or the children were lying when the deputies acted on the children's statements. The complaints contain conclusory assertions of conspiracy, "confinement" of children and intensive questioning.[15] But plaintiffs point to no record evidence which directly or even inferentially suggests perjury by the deputies whether through fabricating charges themselves or through vouching for statements which they had actual knowledge or should have known were false.

If the plaintiffs' theory is that because of alleged inadequate investigation or flawed interrogation, the deputies should not have believed the children's statements, we reiterate that assertions of lack of due care will not suffice to undermine the presump-

tive validity of a sworn statement submitted to obtain a warrant. *Franks v. Delaware, supra,* 438 U.S. at 171, 98 S.Ct. at 2684. To overcome this presumption requires no less than a specific affirmative showing of dishonesty by the applicant. *Id.* We are presented with no factual specificity or record support for the contention that the deputies deliberately falsified reports or reported falsehoods of which they were or should have been aware. The Bentz, Myers and Lallak plaintiffs have failed to make a preliminary showing adequate to overcome the presumed validity of warrant applications which on their face contained information that competent officers could reasonably believe amounted to probable cause. Thus the qualified immunity to which the deputies are entitled by virtue of *Malley v. Briggs, supra,* is not defeated by the plaintiffs' allegations of judicial deception.

**Questioning Children**

We have discussed the absence of support for the contention that detectives Busch, Morgan and Pint either falsified reports or knowingly incorporated falsehoods into their warrant applications. We have also noted the absence of any factual specificity or evidentiary indication of conspiracy involving these officers. The plaintiffs have alleged, however, that the deputies' interrogation conduct was so improper that in essence only fabricated accusations could have emerged from the interview sessions.

We examine the specific interrogation conduct identified in the record to determine whether it so exceeded accepted legal norms for the questioning of witnesses and victims that the interrogating detectives knew or should have known their conduct would violate the rights of accused persons. We do not think it sufficient for purposes of this inquiry to determine only whether fourth, fifth, sixth and fourteenth amendment rights were clearly established in 1984. Our inquiry is whether from a 1984 perspective the law was clearly estab-

---

**15.** The record reveals that "confinement" of children refers to their placement in foster care rather than the circumstances in which they were interviewed.

lished that the conduct in which the deputies engaged would violate such rights.[16]

When no record has been created, only the pleadings are available as a source from which to identify the nature of the allegedly objectionable conduct. However, as in these cases, once affidavits and other materials have been added to the pleadings to clarify and define the nature of the challenged conduct, we do not ignore these materials. We do construe the facts revealed by these materials and all reasonable inferences therefrom in favor of the nonmoving parties when identifying the acts complained of so as to determine whether acts of these kinds were in violation of constitutional standards clearly established at the time. *Mitchell v. Forsyth, supra,* 105 S.Ct. at 2816; *Kompare v. Stein, supra,* 801 F.2d at 886, 889.

As clarified and given substance by the record, the plaintiffs' primary objections to the deputies' interrogation conduct concern the frequency with which children were questioned and the continued questioning of some children after they initially denied sexual abuse. There is evidence that some children who were questioned in these cases consistently denied having been abused and then later made accusations. Others initially denied abuse but talked about "bad secrets" and exhibited fear and sadness when the topic of sexual activity was introduced. Some children recounted events and later recanted them. Others who had initially denied abuse later gave detailed accounts of group "parties" and "games" in which sexual assaults on children had occurred.

Besides extensive and frequent questioning, the plaintiffs have adduced evidence that leading questions, photographs of suspects and information concerning statements by other children were used in some questioning sessions. There is some evidence that an atmosphere was created in which children were encouraged to make revelations.

We do not resolve whether any or all of these questioning techniques were used. There is sufficient evidence in the record to create a triable issue that some or all of this conduct occurred. We address only whether, if these interviewing techniques were used, it was clearly established at the time (if even today) that they were in violation of constitutional standards protecting accused persons from suggestive or coercive interrogation of witnesses and victims.

We have been furnished with no evidence of any generally accepted standard concerning how often and in what circumstances a child who is a suspected victim or who has been identified by others as a victim of sexual abuse may legitimately be questioned without compromising his or her effectiveness as a witness and without conflicting with the rights of any persons subsequently accused by the child. The uncertainty surrounding acceptable investigative techniques for suspected child sexual abuse derives in part from the unique reluctance of victims of this crime to acknowledge that it has occurred. The record contains materials documenting the reluctance of juvenile sexual abuse and incest victims to

---

**16.** Qualified immunity would be meaningless if it could be defeated merely by the recitation of some well-recognized right and a conclusory allegation that the defendant infringed it. To determine a qualified immunity defense, the court must focus on the specific nature of the conduct complained of and the state of the law with respect to the identified conduct at the time the official acted. In *Mitchell v. Forsyth,* for example, the fourth amendment right to be free from unreasonable searches was certainly clearly established when the attorney general ordered wiretaps. What was not clearly established was whether the specific conduct in the context indicated (warrantless wiretapping for

domestic national security purposes) was clearly constitutionally proscribed. *See also Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 3022, 82 L.Ed.2d 139 (1984) (Brennan, J., concurring in part and dissenting in part):

In order to determine whether a defendant has violated a plaintiff's clearly established rights, it would seem necessary to make two inquiries * * *: (1) which particular act or omission of the defendant violated the plaintiff's federal rights, and (2) whether governing case or statutory law would have given a reasonable official cause to know, at the time of the relevant events, that those acts or omissions violated the plaintiff's rights.

disclose the experience.[17] *See, e.g.,* F. SINK AND G. GRAEF, In the Courtroom or the Clinic: Intervention Problems and Solutions with Childhood Sexual Abuse (paper presented at 62nd Annual Meeting of American Orthopsychiatric Association, April 1985 by Frances Sink, Ph.D., Harvard Medical School instructor in child development and psychopathology):

> In the clinical setting, a child's reluctance to disclose sexual abuse and seek help or redress is viewed as a reaction *commonly* associated with abuse. * * * Children consciously and unconsciously deny memories of their abuse. In some cases, the child's fear of retaliation if they disclose is so strong that they force themselves to pretend and not let on to anyone that the abuse occurred, even with direct questioning. Additionally, the painful feelings associated with the abuse, cannot be tolerated by the child and must be repressed along with memories of the events. * * * When disclosure becomes possible, it takes place in a partial, halting fashion: approaching the threatening material and backing away, revealing abuse, then denying it. This process has been called the "No– Maybe– Sometimes– Yes–" syndrome.

*Id.* at 3–5 (emphasis in original). *Accord State v. Myers,* 359 N.W.2d 604, 610 (Minn. 1984):

> If the victim of a burglary failed to report the crime promptly, a jury would have good reason to doubt that person's credibility. A young child subjected to sexual abuse, however, may for some time be either unaware or uncertain of the criminality of the abuser's conduct. * * * [U]ncertainty becomes confusion when an abuser who fulfills a caring-parenting role in the child's life tells the

child that what seems wrong to the child is, in fact, all right. Because of the child's confusion, shame, guilt, and fear, disclosure of the abuse is often long delayed.

*See also Report on Scott County Investigations,* Hubert H. Humphrey III, Attorney General (Feb. 12, 1985) at 10:

> In working with child sex abuse it is not unusual for children to initially deny being abused. In subsequent interviews they may finally admit what happened. However, the Scott County cases raise the issue of how long and how often one can continue to question children about abuse before running the risk of false accusation.

▉▉▉▉ While the record contains examples of investigative mistakes and flawed interrogation, particularly from the standpoint of successful prosecution of those implicated by children who have experienced extensive questioning, an imperfect investigation without more does not deprive the investigators of qualified immunity. Immunity is forfeited for the questioning function upon at least a preliminary showing that the interrogation so exceeded clearly established legal norms for this function that reasonable persons in the detectives' position would have known their conduct was illegal. *See Kompare v. Stein, supra,* 801 F.2d at 887 ("The question is whether the state of the law was such that a reasonable person would have known [his] actions were unconstitutional. Furthermore, a reasonable person is not expected to act as a legal scholar and predict the future direction of the law. Closely analogous cases, decided before the defendant acted * * * are often required to find that a constitutional or statutory right is clearly established.").

---

**17.** The record contains at least one clear example of this problem. In January 1984, shortly after her parents' arrest, B. Brown, then nine years old, adamantly denied to an examining physician that she had ever experienced sexual abuse by family members or others. Her brother, age ten, had already reported to the doctor that an older stepbrother had abused her. When the doctor confronted B. Brown with her brother's statement, she still denied the experi-

ence. Meanwhile, on the same day or shortly thereafter, the stepbrother, then eighteen years old, gave detective Morgan a detailed account of repeated acts of sexual abuse he had performed upon B. Brown and her brother. The stepbrother also described warning his stepsister not to tell. The stepbrother's account of these events does not appear to be contested by anyone connected with these cases.

We conclude that the interviewing conduct occurred in a grey area of investigative procedure as to which there were, and probably still are, less than clearly established legal norms. The grey area referred to involves the extent to which juvenile suspected sexual abuse victims may reasonably be questioned, particularly if they initially deny abuse, and the extent to which leading questions, confrontation with reports by others and photographs of suspects may be used. *Cf. United States v. Dorian*, 803 F.2d 1439 (8th Cir.1986), affirming (over a dissent) the admission of a foster mother's testimony concerning incest reported to her by the criminal defendant's daughter, notwithstanding interviewing techniques including: continued questioning concerning specific acts despite the victim's initial denials, multiple interviews, use of anatomically correct dolls, direct questions regarding touching parts of the body and touching of a hurtful, frightening nature, and questioning by a person (the foster mother) who, because of affection, the child may have wished to please.

We do not consider the standards for the interrogation of juvenile witnesses and victims, particularly in the area of sexual abuse, so clearly established in 1984 that on the basis of hindsight the deputies should now be forced to defend their questioning techniques in these damages suits.[18] Accordingly, we conclude that qualified immunity shields deputy sheriffs Busch, Morgan and Pint from any further litigation of this issue in the cases before us on appeal.

**Separation of Parents from Children**

▪ The *Report on Scott County Investigations*, Hubert H. Humphrey III, Attorney General (Feb. 12, 1985), which plaintiffs and defendants cite in support of various points, concluded that the hasty removal of children from their homes, extensive questioning of juvenile witnesses and initiation of charges before conducting additional investigation undermined the ability of law enforcement personnel to corroborate accusations and achieve successful prosecutions. As an example, as part of the overall investigation, some physical evidence of abuse was recovered.[19] However, law enforcement officers had reason to believe from the statements of certain children that photographs, videotapes and other items of physical evidence were in existence. Nevertheless, when they thought they had probable cause to arrest a suspect and reasonable belief that children were in danger, the sheriff's deputies acted on those beliefs rather than waiting to conduct background investigations, surveillance, mail covers and searches.

Upon the arrests of Tom and Helen Brown, Robert and Lois Bentz, Greg Myers and Donald and Cindy Buchan, their children were removed from the homes of these plaintiffs by sheriff's deputies acting pursuant to MINN.STAT.ANN. § 260.-165(1)(c)(2) (West 1982). Section 260.-165(1)(c)(2) authorizes a peace officer to take a child into immediate custody without a warrant "when a child is found in surroundings or conditions which * * * such peace officer reasonably believes will endanger such child's health or welfare."

With the exception of the Buchans' five year old daughter, the children thus removed had not incriminated their own parents. The issue for immunity purposes therefore is whether the members of the

---

**18.** The nature and extent of permissible interrogation is but one of many unsettled questions in the context of child abuse investigative procedures. *See, e.g., Darryl H. v. Coler*, 801 F.2d 893, 908 (7th Cir.1986), upholding qualified immunity for investigators who, over parental objections, conducted visual inspections of disrobed children for evidence of abuse. "Neither the Supreme Court nor any other circuit has addressed the application of the fourth or fourteenth amendment in the context of a child abuse investigation. The American Civil Liberties Union * * * noted that the application of the fourth amendment to child abuse investigations presents a case of first impression in this circuit." *Id.*

**19.** The affidavits of Morris and deputy sheriff Einertson indicate that objects including candles and bowling pins which children had described as involved in sexual acts were recovered and when tested by BCA scientists were found to be contaminated with human feces.

plaintiffs' family units had a clearly established right to remain together prior to any initiation of charges of intrafamilial abuse.

The prolonged separation of parents and children derived from family court orders finding juvenile protection matters and ordering foster care placement. Thus we understand the claims against the deputies to be directed at the initiation of this process by the summary removal of children before attempts were made to substantiate incriminating statements of other children through normal investigative techniques.

If there was a "legitimate question" as to the legality of summarily separating children from parents who had been accused of criminal acts towards others, the damages claims against Morris[20] and the sheriff's deputies for that conduct are barred by qualified immunity. *See Mitchell v. Forsyth, supra,* 105 S.Ct. at 2820 n. 12; *Patzner v. Burkett,* 779 F.2d 1363, 1370 (8th Cir.1985).

The Supreme Court has recognized a liberty interest which parents and children have in the care and companionship of each other. *See, e.g., Lehr v. Robertson,* 463 U.S. 248, 258 (1983) (" * * * the Court has found that the relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection.").

The right is not absolute, however. "The intangible fibers that connect parent and child have infinite variety * * *. It is self-evident that they are sufficiently vital to merit constitutional protection *in appropriate cases." Id.* at 256 (emphasis added). *See also Backlund v. Barnhart,* 778 F.2d 1386, 1389 (9th Cir.1985) (parents have no clearly established right to unlimited exercise of religious beliefs on their children; the state as parens patriae may, for example, enforce school attendance, prohibit child labor and require vaccination).

The liberty interest in familial relations is limited by the compelling governmental interest in protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves. *See, e.g., Fitzgerald v. Williamson,* 787 F.2d 403, 408 (8th Cir.1986) ("[I]t does not shock our conscience or otherwise offend our judicial notions of fairness to hear that caseworkers responsible for an allegedly abused child arranged for the child to be examined by a psychologist and, after receiving confirmation of child abuse, reduced the parents' visitation rights and permitted the child to remain with her foster parent when the foster parent moved out of the parents' geographical area."). *See also Bohn v. County of Dakota,* 772 F.2d 1433, 1439 (8th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986) (challenged procedures for contesting a child abuse determination were adequate to protect the parents' liberty interest in light of the government's "strong interest in protecting powerless children who have not attained their age of majority but may be subject to abuse or neglect."). *Cf. Walden v. Wishengrad, supra,* 745 F.2d at 152 (commenting on the need for vigorous child protective litigation).

The Seventh Circuit in discussing the meaning of clearly established rights has suggested that if the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered "clearly established," at least in the absence of closely corresponding factual and legal precedent. *Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986). *See also Snyder v. Kurvers,* 767 F.2d 489, 497–98 (8th Cir.1985), reasoning as to privacy rights that the "mere articulation of a general privacy interest * * * does not end the inquiry into the issue of

---

**20.** We do not think that Morris has absolute immunity for this conduct whatever her participation in it, because the removal of children from the homes of persons arrested for sexual abuse is not case initiation, presentation or even preparation, at least when the arrests were not for the abuse of the children being removed. We do consider her shielded by qualified immunity for this function to the same extent and on the same basis as the sheriff's deputies.

[qualified] immunity." The interest asserted "must be examined in the light of the circumstances of the claim." Where the state asserts a compelling interest for intruding into the plaintiff's privacy, the balance may weigh against protection of the right, and the intrusion may be justified.

■ The county attorney's office considered children at risk in homes where the prosecutor and investigators believed there was probable cause that one or both parents had been sexually abusing other children. In our view, the parental liberty interest in keeping the family unit intact is not a clearly established right in the context of reasonable suspicion that parents may be abusing children. If law enforcement personnel who have at least arguable probable cause to believe that adults have been molesting children are not entitled to reasonable belief that the adults may pose a danger to their own children, then the law was (and is) not clearly established on this point. There is certainly no available legal precedent to this effect.

Moreover, in the Brown, Bentz, Myers and Buchan cases, some of the children who reported that these plaintiffs abused them also alleged that these plaintiffs had engaged in sexual acts with their own children. No legal precedent has been offered suggesting that such reports do not suffice to create a reasonable belief that children so identified are in danger. Nor is there any legal precedent which suggests that acting upon a reasonable belief that children are endangered by continued presence in their homes must be deferred until the completion of additional investigation. The "reasonable belief" standard of MINN. STAT.ANN. § 260.165(1)(c)(2) reflects a legislative policy in favor of vigorous and immediate child protective endeavors. Although potentially intrusive, the statute itself is not challenged by the plaintiffs on constitutional or other grounds.

We therefore conclude that there was, at a minimum, a legitimate question concerning the legality of hastily removing minor children from the plaintiffs' custody upon the arrest of one or both parents for sexually abusing other children, at least, as here, in circumstances where the other children had described abuse by the arrested persons upon their own children. The prosecutor and the sheriff's deputies are protected by qualified immunity from any further litigation of this issue in the cases before us on appeal.[21]

**Deputy Sheriff Einertson**

■ Only the Lallaks have sued deputy sheriff David Einertson. The only allegations in the Lallaks' complaint which even arguably refer to Einertson are the following: Paragraph 20 alleges that "[d]efendants and their agents wrongfully, unlawfully * * * began interrogating plaintiffs about alleged child sex abuse and incest" and continued interrogations until May 23, 1984. Paragraph 24 alleges that Einertson, the sheriff and other deputies "exceeded the scope of their agency * * *." Paragraph 29 alleges that all defendants conspired with Morris to invent a sex ring and to target the Lallaks for prosecution recklessly. Paragraph 65 alleges that the county, board of commissioners, county attorney's office and "Scott County Sheriff's Department," among others, failed to supervise and train their agents. We conclude that none of these allegations states a claim against deputy Einertson, that the record contains no evidentiary support for the conclusory allegations that he violated the Lallaks' constitutional rights, and that Einertson is protected by qualified immunity for the acts he did perform.

Questioning suspects is legitimate investigative conduct. The pleadings, record and briefs indicate no theory or facts on which Einertson could be liable for the act of questioning Charles and Carol Lallak. Moreover, the record does not indicate that

---

21. For similar reasons, we conclude that Morris is shielded by qualified immunity from further litigation concerning her participation in obtaining the signature of Wanda Meger on a document authorizing foster care placement of the Megers' sons. Whatever her role in the placement, no efforts were made in this regard until after one or both of the Megers' children had reported having been abused by their father.

he did question them. The allegation that Einertson "exceeded the scope of his agency" does not state a claim for the violation of the Lallaks' civil rights, nor does it convey any information. We have already discussed the absence of any factual specificity or evidentiary support for the conspiracy allegation. Nor do the pleadings, record or briefs describe any specific acts by Einertson allegedly taken in association with or furtherance of an alleged conspiracy.

If the allegation of failure to train and supervise applies to Einertson, and we think it probably applies to Sheriff Tietz only, no indication that Einertson had any duty to train others has been provided. Einertson's own affidavit indicates that he had general supervisory responsibility for detectives Busch, Morgan and Pint. However, we have concluded that these detectives have qualified immunity for the acts of seeking and making arrests and questioning children because their conduct was respectively objectively reasonable and not in violation of clearly established legal norms. If the Lallaks' theory is that Einertson had a duty to protect them from the other deputies' alleged violations of their rights, *see contra Rodgers v. Lincoln Towing Service, Inc., supra,* 771 F.2d at 201 (disposition of the claimed predicate violations unfavorably to the plaintiff defeats this allegation). As for the removal of children from their homes, the Lallak children were removed by Charles and Carol Lallak not the sheriff's deputies. Although as a condition of bail the Lallaks were required to forego contact with their children, no connection between any of the deputies and the bail condition is apparent.

Apart from the facts discussed, Einertson's affidavit reveals that he was the complaining witness against James Rud, and that he approved the decision to arrest Greg Myers and remove the Myers children from their home. We think any connection between these acts, for which we conclude Einertson would have qualified immunity, and any injury to Charles and Carol Lallak is too attenuated to provide the causal connection required for an action under 42 U.S.C. § 1983. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 2433, 2436, 2439–40, 85 L.Ed.2d 791 (1985). For all of these reasons, we reverse the denial of deputy Einertson's motion for summary judgment.

## SHERIFF

██ Scott County Sheriff Douglas Tietz is a defendant in the actions brought by plaintiffs Greg and Jane Myers, Charles and Carol Lallak and Donald and Cindy Buchan. The plaintiffs do not allege that the sheriff personally participated in any deprivation of their constitutional rights, nor can he be liable on a theory of respondeat superior. *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1443 (11th Cir. 1985). Their theory is that the sheriff failed to intervene to remedy abuses committed by his deputies and by Morris and that he was grossly negligent in training and supervising his deputies. *See Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986); *Fundiller v. City of Cooper City, supra,* 777 F.2d at 1443.

We have concluded, as previously stated, that the deputies' conduct in procuring and making arrests was objectively reasonable and that the deputies violated no clearly established constitutional standards in interviewing witnesses and suspected victims and in removing children from the plaintiffs' homes. In addition, the only item of evidence to which the plaintiffs point in support of their claim against Sheriff Tietz is a rough draft of notes prepared by BCA Agent Perron reflecting his memory of an interview conducted with Scott County deputy sheriff David Menden in December 1984. Perron's notes attribute statements to Menden concerning "usurpation" of power by the prosecutor and unsuccessful efforts by Tietz to "rein in" Morris.

Menden, not a party to this lawsuit, has absolutely repudiated Perron's version of this interview and has unequivocally denied making these statements. Perron's draft was concededly dictated from memory of an interview in which he took no notes. The Perron draft does not appear to have

been incorporated into the *Report on Scott County Investigations,* Hubert H. Humphrey III, Attorney General (Feb. 12, 1985). We therefore doubt the admissibility of the notes as substantive evidence.[22] *See* FED. R.EVID. 801(d)(2) (admission by party-opponent), 801(d)(1)(A) (prior inconsistent statement), 803(8)(C) (public report of investigation). Moreover, even if Perron were to testify at a trial that Menden made the statements attributed to him, the Menden opinions amount to no more than assertions of negligent failure by the sheriff to defend his office against encroachment by the prosecutor. As we discuss *infra,* allegations of negligent conduct do not state a claim for any due process violation. We therefore reverse the district court's denial of the sheriff's motions for summary judgment.

## JORDAN POLICE OFFICER NORRING

■ The district court dismissed the claim by the Lallak plaintiffs against Jordan police officer Larry Norring for lack of a submissible issue of fact concerning any act by Norring which caused the arrest and prosecution of Charles and Carol Lallak. We agree.

The Lallaks assert that Norring had two motives for injuring them, first an alleged personal dislike of Greg Myers and second, an alleged desire to retaliate for the Lallaks' efforts in the spring and summer of 1984 to promote an investigation of the Jordan police department. The Lallaks, however, have failed to identify any actual acts by Norring which contributed to their arrest and criminal charges. As an example, they characterize the May 1984 reports by A. Myers (twelve year old male) about events at the Quarry Campgrounds as the moving force in the Lallaks' arrest. However, they do not suggest that Norring had any connection with those reports which were provided to deputies Busch and Pint, guardian Paul Thomsen and therapist Tom Price.

As we have previously stated, broad conclusory allegations of conspiratorial purpose and involvement, without factual specificity or record support, are properly dismissed at a pretrial stage. Apart from the lack of evidence of his participation in a conspiracy, no causal connection between Norring and the Lallaks' arrest and prosecution is discernible from the pleadings or the materials which have been provided to supplement the pleadings. "Causation is an essential element of a section 1983 cause of action." *Morton v. Becker,* 793 F.2d 185, 187 (8th Cir.1986). We therefore affirm the dismissal of the Lallaks' claim against officer Norring.

## GUARDIANS, THERAPISTS, ATTORNEY

■ Diane Johnson, John Manahan and Paul Thomsen are attorneys engaged in the practice of law in Minnesota. After the initiation of neglect proceedings, the family court pursuant to MINN. STAT. ANN. § 260.155(4) (West 1982 and Supp. 1987) appointed Johnson and Manahan to serve as guardians ad litem for the Brown, Buchan and Rawson children and appointed Paul Thomsen as guardian for the Bentz and Myers children. The guardians participated in family court hearings, monitored and attended interviews between children and law enforcement personnel, sought the appointment of therapists for their wards, and made recommendations to the court concerning visitation with parents and participation in criminal proceedings.

Michael Shea and Leslie Faricy are licensed psychologists practicing in Minnesota. Shea is the sole proprietor of Michael Shea & Associates, P.A. and employs Faricy. Shea and Faricy provided psychological evaluations of and therapy to the Bentz children by order of the family court pursuant to MINN. STAT. ANN. § 260.-151(1) (West 1982). They concluded that the three Bentz children were victims of sexual abuse, reported their opinions to the

---

22. "Without a showing that admissible evidence will be available at trial, a party may not rely on inadmissible hearsay in opposing a motion for summary judgment." *Pink Supply Corp. v. Hiebert, Inc.,* 788 F.2d 1313, 1319 (8th Cir.1986).

family court and recommended continuation of foster care and therapy.

Thomas Price is a social worker/therapist in association with Phipps-Yonas & Price, P.A. He was designated by the family court to determine the therapeutic needs of the Myers children. He is not a licensed "physician, psychiatrist, or psychologist," which section 260.151(1) expressly authorizes the family court to appoint for purposes of examining a minor within its jurisdiction, and he provided therapy rather than merely recommending it. Nevertheless, the family court appointed him and, with knowledge of his professional qualifications and counseling activities, the court repeatedly overruled motions by Greg and Jane Myers seeking Price's removal. Price actively questioned the two older Myers children in crucial interviews between those children and law enforcement personnel. He also reported his opinions to the family court and law enforcement personnel that the children had been sexually abused by their parents and other plaintiffs in these cases.

Susan DeVries is a licensed, practicing psychologist. Her affidavit and that of the guardian for the Buchan children state that DeVries was retained pursuant to the family court's direction to the guardian to obtain a psychological evaluation. Moreover, she was paid in the same manner as the appointed therapists. However, no formal court order issued appointing her, and the district court considered the origin of her professional involvement with the Buchan children a fact question. DeVries met with the Buchan children (aged five, two and one-half and twenty months), provided a report in which she concluded that the two older children showed signs of sexual abuse, and testified before the family court.

Wright Walling was the court-appointed counsel for S. Rawson and, when their interests did not conflict, her guardian Diane Johnson. Walling is generally alleged to have participated in the continued presence of S. Rawson in foster care with limited parental visitation.

Summary judgment was warranted in favor of each of these defendants on a number of bases. As previously discussed, the plaintiffs have not succeeded in pleading or supporting a colorable claim of conspiracy. In particular, they have provided virtually no factual specificity in their complaints as to the guardians, therapists and appointed attorney. Moreover, the voluminous record in these cases lacks facts or inferences suggesting any mutual agreement between these professionals and others to engage in conduct in violation of the plaintiffs' rights. The guardians, therapists and attorney, like other defendants, questioned children concerning whether abuse had occurred and reported the results of their inquiries.

Very few facts accompany even the charges of improper questioning. In the case of Susan DeVries, for example, no factual particularity at all is offered concerning any objectionable interrogation techniques. Absent any information concerning improper questioning methods, we are at a loss to understand how a psychological evaluation or therapy can be accomplished for a juvenile suspected victim of sexual abuse if questioning itself is not permitted.

At the very least, the guardians, therapists and appointed attorney are protected by qualified immunity for the questioning function on the same basis as the deputy sheriffs previously discussed. If clearly established constitutional norms govern this conduct, they have not been cited to us.

In addition, the guardians, therapists and the attorney have absolute immunity for any damage claims based on the function of testifying before the family court. *See Briscoe v. LaHue,* 460 U.S. 325, 335–41, 103 S.Ct. 1108, 1115–18, 75 L.Ed.2d 96 (1983). We think the immunity extends beyond oral testimony to providing their reports and recommendations to the family court.

■ We also agree with the district court that nonjudicial persons who fulfill

quasi-judicial functions intimately related to the judicial process have absolute immunity for damage claims arising from their performance of the delegated functions. *See, e.g., Demoran v. Witt,* 781 F.2d 155, 157 (9th Cir.1986) reasoning that probation officers serve a function integral to the judicial process when they prepare presentence reports for a judge. In that capacity they "act as an arm of the sentencing judge" in light of the judge's request that they perform the function, the statutory authority for this delegation of duty and the judge's use of the report in performing judicial duties, i.e., sentencing decisions. *See also Kurzawa v. Mueller,* 732 F.2d 1456 (6th Cir.1984) (psychologist, psychiatrists, guardian ad litem); *Lawyer v. Kernodle,* 721 F.2d 632 (8th Cir.1983) and cases cited therein (pathologist appointed to assist a coroner); *Ashbrook v. Hoffman,* 617 F.2d 474 (7th Cir.1980) (court-appointed partition sale commissioners); *Wagner v. Genesee County Board of Commissioners,* 607 F.Supp. 1158 (E.D.Mich.1985) ("friend of the court" integrally involved in family court proceedings).

With the possible exception of Susan DeVries whose appointment is in dispute, the other therapists, guardians and attorney were appointed to fulfill quasi-judicial responsibilities under court direction. The family court was required to determine whether the children in its custody were neglected and to secure appropriate placements. To perform these functions, the court exercised its statutory authority to seek the assistance of experts. *See* MINN. STAT. ANN. §§ 260.151, 260.155(2), (4) (West 1982 and Supp. 1987). The absolute immunity which is accorded persons acting as an integral part of the judicial process protects them from having to litigate the manner in which they performed their delegated functions. We conclude that encompassed within the delegated functions was the authority and perhaps the duty to ascertain what had happened from the children's point of view. Questioning the children was necessary to perform the functions of determining the children's needs, protecting their interests and making recommendations to the family court. Therefore, in the alternative to their qualified immunity for this conduct, the appointed guardians, therapists and attorney have absolute immunity for claims arising from the function of questioning children.

We are less certain whether the absolute immunity which shields these professionals for their role in questioning children extends to reporting the results of their inquiries to law enforcement personnel. However, if the reporting conduct was beyond the scope of the official duties which the guardians, therapists and attorney were appointed to perform and was undertaken on their own initiative as private persons reporting suspected criminal acts, then we do not consider this conduct action under color of state law. *See Benavidez v. Gunnell,* 722 F.2d 615, 618 (10th Cir.1983) ("We know of no case in which the report of a state crime is action under color of state law under § 1983."). *Accord Tauvar v. Bar Harbor Congregation of Jehovah's Witnesses, Inc.,* 633 F.Supp. 741, 747 (D.Me.1985), *aff'd,* 787 F.2d 579 (1st Cir. 1986).[23]

A private party who conspires with a state actor, e.g., a prosecutor, may act under color of state law. *Dennis v. Sparks,* 449 U.S. 24, 27–29, 101 S.Ct. 183, 186–87, 66 L.Ed.2d 185 (1980). But, as here, in the absence of a sufficiently pleaded conspiracy claim or a genuine factual issue of conspiracy between private parties and state actors, the private individuals were not acting under color of state law for purposes of 42 U.S.C. § 1983 by virtue of the conspiracy claim. *See Malachowski v. City of Keene,* 787 F.2d 704, 710–11 (1st Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986).

The claims of Coralene Rawson against guardians ad litem Johnson and Manahan and appointed attorney Walling present two additional issues, one concerning family court jurisdiction and the other alleging interference with S. Rawson's religious ob-

**23.** This conclusion applies as well to Susan DeV- ries.

servances. In September 1984, the family court found S. Rawson to be a neglected child. In October 1984, S. Rawson recanted her prior testimony. In November 1984, the family court vacated its neglect findings and ordered a new trial. (The state Attorney General's office had replaced the county attorney in the family court proceedings, and state representatives opposed the return of S. Rawson to her parents, as did her guardian.) In February 1985, the Minnesota Court of Appeals dismissed Coralene Rawson's appeal from the family court's order for new trial and refused to enter a summary reversal. Coralene Rawson asserts that the family court lacked jurisdiction or power to order a new trial once the prior neglect findings had been vacated. She also alleges other procedural irregularities.

We "do not review state court civil proceedings under the guise of the Civil Rights Act." *Malachowski v. City of Keene, supra,* 787 F.2d at 708 (citation omitted). Although directed at her daughter's guardians ad litem and appointed attorney, the substance of Coralene Rawson's claims against these defendants amounts to no more than a protest that the family court acted improperly by retaining custody of S. Rawson, ordering a new trial and failing to observe procedural formalities having to do with amending petitions. The irregularities, if any, and rulings by the state courts are not attributable to the defendant guardians and attorney. Nor could these defendants have seized S. Rawson and returned her to plaintiff in disregard of the family court's orders, had they wanted to. Nor did the family court's alleged failure to observe certain procedural rules, if true, result in a clear absence of jurisdiction, creating some sort of jurisdictional hiatus in the family court during which the defendants could or should have seized the child on behalf of her mother. Moreover, plaintiff has offered no source from which a legal duty to do so could be inferred.[24]

In addition, plaintiff seeks to hold the guardians liable for an alleged failure to ensure that S. Rawson attended Jehovah's Witness services while in foster care. Although phrased in terms of impeding first amendment rights to the free exercise of religion, once again the focus of the claim is to hold these defendants responsible for a family court decision that S. Rawson did not have to attend services if she did not want to. We question whether these additional allegations by Coralene Rawson state a section 1983 claim for relief. If they do, however, defendants Johnson, Manahan and Walling are shielded by qualified immunity from further litigation of these claims in the absence of any identified legal duty to behave otherwise or any clearly established legal rights violated by the alleged conduct.

## NEGLIGENCE

■ The alleged failure by Sheriff Tietz to supervise his deputies is characterized by plaintiffs as "grossly negligent." In addition, various plaintiffs allege that all defendants, in addition to conspiring against them, were "grossly negligent" in contributing to their prosecution and the removal of children from their homes.

The Supreme Court has recently concluded that negligent conduct by state actors does not implicate any aspect of the due process clause. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 663, 665, 666, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 670, 671, 88 L.Ed.2d 677 (1986). Thus allegations that the sheriff or other defendants deprived plaintiffs of procedural or substantive due process interests through negligent or "grossly negligent" conduct does not state a claim under 42 U.S.C. § 1983. *See Davidson, supra,* 106 S.Ct. at 670, 671:

> In *Daniels,* we held that the Due Process Clause of the Fourteenth Amendment is not implicated by the lack of due

---

**24.** In any event, violation of a state statute limiting the jurisdiction of a state court is not the automatic equivalent of violation of the federal Constitution. Section 1983 actions do not lie to vindicate rights derived solely from state law.

care of an official causing unintended injury to life, liberty or property. In other words, where a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required. * * * As we held in *Daniels,* the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by * * * officials.

## STATE LAW

Certain plaintiffs have alleged that the defendants violated various provisions of state law. Some of the state legislation, such as Human Services Department regulations and a statutory provision calling for a "Tennessen warning" by social workers,[25] do not apply to any of the defendants whose actions are before us on appeal. We examine the remaining provisions to determine whether their alleged violation bears on the immunity defenses at issue in these appeals.

*Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) indicates that unless the rights which form the basis of the plaintiffs' civil rights claims were conferred by state law, a violation of state law is neither cognizable under section 1983 nor results in forfeiture of immunity for the alleged violation of rights which have independent constitutional origin. *Id.* 104 S.Ct. at 3019–20, 3020 n. 12. In the plaintiffs' cases, the rights asserted are all of federal constitutional origin, such as the fourth amendment right to be free from arrest without probable cause, the liberty interest in the family unit and fair trial, due process rights. None of these interests is conferred by Minnesota legislation.

■ In the case of therapist Tom Price, for example, an alleged violation of state legislation prohibiting practicing psychology without a license in no sense bears on the Myers', Lallaks' and Buchans' claims against this defendant. Their objection to

his conduct concerns his role in questioning children and allegedly eliciting fabricated accusations against themselves, an objection which is unrelated to state licensing requirements.

■ Similarly, MINN. STAT. ANN. § 626.556 (West 1983 and Supp. 1987) imposes reporting duties on persons with knowledge of child abuse or neglect. Subdivision 10 of the statute directs law enforcement and local welfare agencies, upon receipt of a report that a family member has abused or neglected a child, to investigate, conduct assessments, maintain records and offer "protective social services for purposes of preventing further abuses, safeguarding and enhancing the welfare of the abused or neglected minor, and preserving family life whenever possible." If this provision even applies to any defendant currently before us, and even if the foregoing language can be construed as some sort of command to avoid fragmenting families, the statute is not the source of the liberty interest in the family unit which the plaintiffs have sued to vindicate. At most, the statute establishes guidelines to be followed as a matter of state law and neither confers nor embodies any constitutionally-protected right asserted by the plaintiffs. *See generally Coleman v. Frantz,* 754 F.2d 719, 729–30 (7th Cir.1985) (state statutes did not bear on plaintiff's claim of constitutional right and created inadequately defined duties; thus sheriff lost no immunity for violation of either constitutional or statutory rights allegedly resulting from noncompliance with state law).

■ MINN. STAT. ANN. § 260.-165(1)(c)(2) (West 1982), previously discussed, authorizes police officers to take a child into immediate custody upon reasonable belief that present surroundings or conditions endanger the child. The plaintiffs who assert that the deputy sheriffs violated this statute have not identified the

---

**25.** "This warning is part of the Government Data Practices Act, Minn.Stat. §§ 13.01–.88, and it requires social workers to, inter alia, inform interviewees whether they may refuse to answer

questions and why information is being sought." *In re Scott County Master Docket, supra,* 618 F.Supp. at 1564.

nature of the alleged violation. Presumably the deputies' "reasonable belief" is at issue. Because the claims against the deputies for removing children from the plaintiffs' custody are founded on the constitutional interest in maintaining the family, any violation of section 260.165(1)(c)(2) would not bear upon nor defeat immunity for the constitutional claim.[26] This state statute does not give rise to the rights which plaintiffs assert were violated when their children were removed from their homes, brought before the family court and made the subject of neglect proceedings. This and the other state laws discussed do not provide the basis for the federal claims sued upon, are not independently actionable under 42 U.S.C. § 1983 and result in no loss of immunity for the federal claims which are cognizable under section 1983. *Davis v. Scherer, supra,* 104 S.Ct. at 3020 n. 12; *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985).

Finally, Coralene Rawson's complaint alleges that various defendants including her daughter's guardians ad litem, Diane Johnson and John Manahan, and court-appointed attorney Wright Walling, violated and conspired to violate various Minnesota criminal provisions concerning kidnapping of children, damage and trespass to property, being dangerous offenders and aiding and abetting criminal acts. No authority whatever has been provided to the effect that these statutes create a cause of action enforceable by private individuals under 42 U.S.C. § 1983 or otherwise.

In summary, in the cases before us on appeal, we affirm the orders of the district court granting summary judgment in favor of Wright Walling, Diane Johnson, John Manahan, Paul Thomsen, Thomas Price, Phipps-Yonas & Price, P.A., Michael Shea, Leslie Faricy, Shea & Associates, P.A., and Larry Norring. We reverse the orders of the district court denying summary judgment to Susan DeVries, R. Kathleen Morris, Douglas Tietz, Michael Busch, Patrick

Morgan, Norm Pint and David Einertson. We remand for proceedings consistent with our decision.

FLOYD R. GIBSON, Senior Circuit Judge, concurring.

I concur in the court's opinion and judgment, but write separately to express my misgivings with the manner in which the child abuse cases were handled by the Scott County authorities. The detailed accounts of sexual abuse given by the children required the authorities to act, and their action, as the court holds today, is protected. The children's accounts are so startling and egregious, however, that it is difficult to accept the prosecutor's dismissal of the charges against the parents and other parties charged. The charges were dismissed by the prosecutor allegedly to avoid compromising an investigation of greater magnitude. Yet even after this investigation was no longer a concern, the charges were not reinstated. The children's accusations, if true, demand the prosecution of the guilty parties. The prosecutor's action in dismissing the charges leaves this shocking and abusive affair in limbo.

On the other hand, if, as alleged, the prosecutor fabricated charges, coerced testimony, and withheld and destroyed evidence in pursuing the accusations against the plaintiffs, her conduct demeaned our system of justice and undermined the faith placed in that system by the people of Scott County. Child abuse cases should be handled cautiously from the investigative stage to the final stage, keeping in mind the rights of both the children and the parents. These child abuse cases were not handled in such a manner.

I also express concern over the considerable difficulty in ascertaining what really happened in Jordan, Minnesota during 1983–84. That difficulty may be attributable to the nature of this case. Some cases are more difficult than others, but cases

---

**26.** In any case, we have already held that reasonable officials could have had such a "reasonable belief."

involving alleged sexual abuse of children are extremely perplexing, and even more troublesome when the children's parents are the alleged source of that abuse. The difficulty also may be attributable to the circumstances of this particular case. Some children were interviewed numerous times over several months before they acknowledged that they had been abused. Evidence was withheld and destroyed. Ultimately charges were dismissed and some of the children later recanted their accusations.

In any event, I agree with the court's disposition of the plaintiffs' claims against the defendants in this case.